Argued and submitted June 22, 2005, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded for further proceedings May 25, 2006

STATE OF OREGON,
*Respondent on Review,*

*v.*

DAWN ELLEN ROBLE-BAKER,
*Petitioner on Review.*

(CC 001743FE; CA A118722; SC S51978)

136 P3d 22

Jennelle Meeks Barton, Deputy Public Defnder, argued the cause and filed the brief for petitioner on review. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

David Amesbury, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs, De Muniz,*** Balmer, and Kistler, Justices.

KISTLER, J.

---

** Chief Justice when case was argued.

*** Chief Justice when decision was rendered.

## KISTLER, J.

The issue in this case is whether the police violated defendant's state constitutional right against compelled self-incrimination when they failed to advise her of her *Miranda* rights before she admitted to killing her husband.[1] The trial court concluded that the officers had not violated defendant's rights, and the Court of Appeals affirmed without opinion. *State v. Roble-Baker*, 195 Or App 415, 99 P3d 1239 (2004). We reach a different conclusion and accordingly reverse the Court of Appeals decision and the trial court judgment.

We state the facts consistently with the trial court's explicit and implicit factual findings. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Skeletal remains were discovered on March 12, 2000, in the back yard of defendant's former rental home in Trail, Oregon. Before the police had identified the remains, defendant telephoned the police, claiming that her family members had told her that her husband's wallet and identification had been found near the remains and that police might be looking for her. Detective Newell returned defendant's call and asked about her husband's whereabouts in the preceding years. Defendant told Newell that her husband had left her three or four years earlier, that she believed he was living in Portland, but that she did not know how to get in touch with him. Defendant gave Newell her home and work telephone numbers and told him that he could contact her if he had any more questions.

The skeletal remains were positively identified as being those of defendant's husband on April 4, 2000. The next day, Newell and Detective Wright went to defendant's place of employment and asked her if they could interview her. Defendant agreed to talk with the detectives, but her supervisor asked that the detectives conduct the interview elsewhere. The detectives suggested that they conduct the interview at the Oregon State Police Headquarters, a

---

[1] Article I, section 12, of the Oregon Constitution is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution, as described in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). *See State v. Magee*, 304 Or 261, 265-66, 744 P2d 250 (1987) (so stating). For ease of reference, we refer to those warnings as *Miranda* rights or *Miranda* warnings.

20- to 25-minute drive from defendant's office. They told defendant that they could drive her to the police headquarters and that they would bring her back to her office after the interview. She agreed.

Defendant and the two detectives arrived at police headquarters at about 10:00 a.m. They sat in the facility's interview room and discussed defendant's relationship with her husband and the circumstances of his disappearance. Newell explained:

> "We were asking questions about the circumstances of her marriage, her relationship with her husband, the—where they had lived, children, what was the—the relationship, the family life like? When was the last time she had seen him, the circumstances concerning the fact that he had left her and where they were living at the time he left her."

Newell described the atmosphere during the interview as "relaxed," with defendant periodically taking breaks to use the bathroom or smoke cigarettes outside the building.

Throughout those initial discussions, defendant denied having any knowledge about her husband's death. Based upon that denial, Newell suggested that defendant take a polygraph test. He explained:

> "I mentioned to her that this was a serious investigation. I explained to her that the remains had been identified and they were her husband's. And she offered some explanations for that.

> "I suggested a polygraph test, and she told me that she would not take a polygraph test, that she didn't believe they were reliable. * * *

> "So I explained to her that, you know, with—with a polygraph test she could take, she could be truthful and we could eliminate her from any further concern."

Because defendant claimed to be concerned about the test's reliability and was reluctant to take it, Wright suggested that defendant discuss the test with Detective Phillips, a polygraph examiner for the Oregon State Police. Defendant agreed to do so and met with Phillips at approximately 12:25 p.m., almost two and one-half hours after she had first arrived at police headquarters.

According to Phillips, the purpose of his conversation with defendant was to "clear up any questions that she had about a polygraph exam." He gave her an "overview of what the exam [was] going to be like," and explained to her that, before the examination, she would be given *Miranda* warnings and that any participation on her part would be voluntary. During the course of the conversation, defendant agreed to take the test but asked Phillips if she could do so the following day. Phillips told her that, although he did not believe she would come back the next day, "she'd always been free to leave," and that "if she wanted to take the test [the next day], that would be fine." At 1:55 p.m., after talking with defendant for one and one-half hours, Phillips told defendant that they would check with Newell and Wright to see if they had any more questions for defendant and to confirm an appointment for a polygraph test the next day.

While Phillips was discussing the polygraph test with defendant, two detectives had gone to interview defendant's son at his elementary school to "get some background into the investigation." When Phillips and defendant returned to the interview room and Phillips informed the detectives that defendant wanted to go home, Wright told defendant that her son was being interviewed. Because school ended early that day, he told her that the detectives would bring her son back to police headquarters when they were done.

Concerned that defendant would not return the next day, Newell suggested that defendant listen to some additional facts regarding their investigation of her husband's death. He described that conversation as follows:

"I was sitting in the interview room and Detective Phillips and [defendant] came into the room.

"* * * * *

"Detective Phillips stood in the doorway and he said that they had talked about a possible—or a—talked about something and wanted to share it. Detective Phillips had said that he had talked to [defendant] and she wanted to go home, she wanted to think about things. We had talked a lot, and that she could come back the next day, take an

interview and—or to give an interview or to take a poly-graph test. And Detective Phillips thought that was a good idea and he was throwing it out for discussion.

"* * * * *

"At that point, I—I expressed my concern that she wouldn't come back. I thought that she could blow us off, just—just choose not to come back. And I told her that[,] 'Maybe you should hear some more information,' you know, explain to her more of the facts that we knew, and I began to explain those facts to her."

After Newell explained those additional facts, defendant sud-denly stood up and said, " 'Well, why don't you just take me out and hang me?' "[2] She then walked outside to the smoking area, stating, " 'I need a smoke.' "

Newell followed defendant outside to the smoking area, and Wright joined them shortly afterwards.[3] As defen-dant smoked her cigarette, Newell told her to tell him why she had killed her husband. He testified:

"I told her that it was—that it was real important to tell us why she had killed her husband. I said there's a lot of rea-sons, you know, and it's important to know why."

Although there were long periods during which defendant did not respond to Newell, she told him that she would make a statement after speaking with her son. She said, " 'I don't have any friends to talk to and I don't know any attorneys. I just want to spend some time with [my son].' "

Because defendant was emotional, Newell was con-cerned that she would harm herself or her son. He told her, " 'I'm afraid that you will hurt yourself and you could hurt yourself or your son both because of this whole thing coming to light.' " Defendant did not respond. He then suggested what he described as "a compromise," stating to defendant,

---

[2] The evidence at the suppression hearing does not disclose what Newell told defendant. Apparently relying on a police report that was not admitted into evi-dence, the trial court found that Newell had told defendant that he was concerned about her safety and that it was reasonable to consider her a suspect. There is no evidence in the record, however, from which the trial court could have made that finding.

[3] Before Wright joined defendant and Newell in the smoking area, he learned that defendant's son had arrived at police headquarters.

" 'Why don't we end this nightmare now, and then you can talk to your son * * *.' " Newell testified that the conversation was "taking place over some time" because "she was smoking cigarettes and she was pretty emotional." He stated that "[t]here was times when she would just be quiet, she wouldn't say anything." Eventually, Newell faced defendant and asked her, " 'Did he deserve that?' " She responded "no," explaining that " '[w]e had some bad times, but he was a good man.' " At some time between 3:00 p.m. and 4:00 p.m., approximately five to six hours after the detectives began questioning her, defendant said, " 'I hope I'm doing the right thing,' " and then she confessed to killing her husband, claiming she had done so in self-defense.

Newell ended the interview, and Wright told defendant that her son was at police headquarters.[4] As Newell and defendant walked back into police headquarters, Newell told defendant that she needed to make arrangements for her son. Shortly after 4:00 p.m., the detectives allowed defendant to spend time alone with her son. At about 6:00 p.m., after speaking with her son and eating dinner with the detectives, defendant agreed to give a taped interview. At the beginning of that interview, Newell read defendant her *Miranda* rights. On learning her rights, defendant invoked her right to an attorney, and the detectives terminated the taped interview.

The state charged defendant with murder. Before trial, defendant filed a motion to suppress the statements she made to the detectives, arguing that the detectives should have given her *Miranda* warnings before questioning her and that her statements were involuntary.[5] She maintained that admitting her statements at trial would violate her rights against compelled self-incrimination under both Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

The trial court rejected defendant's arguments in part, suppressing only the statements that she had made

---

[4] Newell did not know that defendant's son had arrived at police headquarters until Wright told defendant.

[5] Defendant also argued that her statements should be suppressed because they were the product of an illegal seizure of her person in violation of Article I, section 9, of the Oregon Constitution. She has abandoned that argument on review.

after she had admitted killing her husband. The court reasoned that *Miranda* warnings were required after that admission because only at that point was she in police custody. The statements that preceded her arrest, the court concluded, were voluntary and therefore admissible.

Following the trial court's ruling, defendant entered a conditional plea of guilty to the charge of manslaughter in the first degree, with leave to appeal the trial court's ruling on her motion to suppress. *See* ORS 135.335(3) (authorizing defendants to enter conditional guilty pleas reserving right, in writing, to appeal adverse pretrial rulings). She appealed, and the Court of Appeals affirmed the trial court's judgment without opinion. *Roble-Baker*, 195 Or App at 415. We allowed review to consider whether the detectives obtained defendant's statements in violation of her rights under either the state or the federal constitution. We begin with defendant's argument that Article I, section 12, of the Oregon Constitution required the detectives to give defendant *Miranda* warnings before she admitted killing her husband. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (stating ordinary sequence of analysis).

■    Article I, section 12, provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination under that section, this court has held that, before questioning, police must give *Miranda* warnings to a person who is in "full custody" or in circumstances that "create a setting which judges would and officers should recognize to be 'compelling.' " *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (quoting *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987)) (internal quotation marks omitted).

On review, defendant argues that, at three distinct points during her conversations with the police, the circumstances became "compelling," triggering the requirement that the police give her *Miranda* warnings. First, she contends that the circumstances became compelling when Newell suggested that she take a polygraph test. In the alternative, she asserts that the circumstances became compelling after she expressed to Phillips her desire to leave police headquarters. Finally, she argues that the circumstances

became compelling when Newell suggested "a compromise," stating to defendant, " 'Why don't we end this nightmare now, and then you can talk to your son * * *.' " Accordingly, defendant maintains that the trial court erred when it failed to suppress her statements following those distinct points that she now identifies.

Before considering whether the detectives placed defendant in compelling circumstances, we first address the state's contention that defendant failed to preserve that issue for this court's review. The state maintains that, before the Court of Appeals, defendant sought suppression of *all* her statements, failing to identify—as she does on review—the specific points at which the circumstances became compelling. Because defendant seeks to suppress fewer statements on review than she attempted to suppress on appeal, the state contends that defendant failed to preserve her claim that the detectives placed her in compelling circumstances. As explained below, we conclude that defendant preserved her *Miranda* claim.

As a general rule, this court will not consider an issue that the appellant did not preserve. *See State v. King,* 307 Or 332, 338, 768 P2d 391 (1989) (declining to consider issues that were not presented to the Court of Appeals). Two purposes of that rule are to promote judicial efficiency and to ensure that "parties are not taken by surprise, misled, or denied opportunities to meet an argument." *Davis v. O'Brien,* 320 Or 729, 737, 891 P2d 1307 (1995). In determining whether a party's argument is properly preserved for this court's review, "we view the record in light of the purposes of fairness and efficiency that underlie the preservation requirement." *Northwest Natural Gas Co. v. Chase Gardens, Inc.,* 328 Or 487, 499-500, 982 P2d 1117 (1999).

Defendant first raised the legal issue relevant to this case—*i.e.,* whether she was in compelling circumstances when she made unwarned statements to police—before the trial court in her motion to suppress. After defendant filed that motion, it was the state's burden to show that defendant's unwarned statements were made before the circumstances became compelling. *See State v. Stevens,* 311 Or 119, 137, 806 P2d 92 (1991) (holding that the state must prove the

voluntariness of a defendant's statements under Article I, section 12, by a preponderance of the evidence). The trial court denied defendant's motion, and she raised the issue again on appeal. Although defendant now identifies three alternative points at which she contends the circumstances became compelling, neither the state's obligation nor the reviewing court's inquiry has changed. The state still must show that defendant's unwarned statements were not made while she was in compelling circumstances, and the reviewing court must determine the point at which, if ever, the circumstances became compelling. We conclude that the state has not been taken by surprise, misled, or denied the opportunity to meet defendant's arguments. Accordingly, we conclude that defendant properly preserved her *Miranda* claim and that we may consider it on review.[6]

■ We now turn to defendant's argument that her encounter with the detectives evolved into "a setting which judges would and officers should recognize to be 'compelling.'" *Magee*, 304 Or at 265. In deciding whether a defendant's encounter with police officers has so evolved, this court has considered a host of factors, including: (1) the location of the encounter, *Smith*, 310 Or at 7 (concluding that circumstances were not compelling, in part, because detective met with defendant in noncustodial facility "in surroundings relatively familiar to defendant"); (2) the length of the encounter, *State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997) (concluding that circumstances were not compelling, in part, because "[t]he stop as a whole, and the questions, were brief"); (3) the amount of pressure exerted on the defendant, *State v. Carlson*, 311 Or 201, 205, 808 P2d 1002 (1991) (concluding that circumstances were not compelling, in part, because there was no evidence that "police coerced or pressured

---

[6] The state bases its contrary argument on the rule that a general objection to the admission of evidence is insufficient to preserve that issue for appellate review if any part of the evidence is admissible. *See State v. Brown*, 310 Or 347, 359, 800 P2d 259 (1990) (stating rule). That rule, however, applies to the admission of evidence at trial and requires the parties to put the trial court on notice of the specific problems that a party perceives regarding the proffered evidence. In this case, the question presented by defendant's pretrial suppression motion was the point, if any, at which the circumstances became sufficiently compelling to require *Miranda* warnings. As explained above, defendant's pretrial motion and her brief in the Court of Appeals put both the state and the courts on notice of that issue.

defendant to answer questions"); and (4) the defendant's ability to terminate the encounter, *Magee*, 304 Or at 265.

■ Those factors are neither the exclusive factors that this court will consider, nor are they to be applied mechanically. Rather, in determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract. *See Magee*, 304 Or at 264-65 (recognizing that state *Miranda* requirement protects same interests as federal requirement); *Miranda v. Arizona*, 384 US 436, 455-57, 86 S Ct 1602, 16 L Ed 2d 694 (1966) (explaining that warnings are necessary to ensure that a person's statement is truly the product of free choice when that person is placed in an "incommunicado police-dominated atmosphere").

In arguing that the circumstances here were not compelling, the state relies primarily on the fact that defendant was free to leave. It notes that defendant was "neither told that she could not leave, nor prevented from leaving, until after she was told she was under arrest." Therefore, it maintains, the detectives did not place her in compelling circumstances until after she had confessed to killing her husband and the detectives had told her she was under arrest.

■■ As the state's argument recognizes, in determining whether the detectives placed defendant in compelling circumstances, an important consideration is whether they prevented her from leaving and thereby ending the encounter. Forced detention can become tantamount to an arrest, which will trigger the need for *Miranda* warnings. Consistently with that principle, this court has held that compelling circumstances exist when a police officer tells a defendant that he or she is not free to leave the police station and terminate the encounter. *See Magee*, 304 Or at 266 (holding that *Miranda* warnings were required before questioning when police officer told defendant he could not leave police station). Conversely, when a police officer tells a defendant that he or she may terminate the encounter—and then allows that defendant to do so—the officer has not placed the defendant in compelling circumstances. *See State v. Johnson*, 340 Or

319, 332, 131 P3d 173 (2006) (holding that defendant was not in compelling circumstances, in part, because "when he asked the investigators to terminate the interview and return him to his home, they did so").

Here, the detectives never explicitly told defendant that she could not leave police headquarters and, during Phillips' discussion with defendant, he told her that "she'd always been free to leave." However, as explained below, the detectives' actions undercut the force of Phillips' statement.

After defendant told Phillips that she wanted to go home, Phillips relayed that conversation to the other detectives. In response, Newell "expressed [his] concern that she wouldn't come back" and told her that "[m]aybe [she] should hear some more information." Although the detectives did not explicitly tell defendant that she could not leave, as was the case in *Magee*, they also did not honor her request and terminate the interview, as was the case in *Johnson*.

Additionally, and more importantly, the detectives created a situation in which defendant was required, for all practical purposes, to remain at the police headquarters. Because the detectives had driven defendant to the police headquarters—a 20- to 25-minute drive from her work—defendant was dependent upon them for leaving; she was not free to leave unless and until they agreed to take her back to work. Beyond that, the detectives had told defendant that police officers were interviewing her son at his elementary school and that they would bring him to police headquarters when they were finished.

Assuming that, with greater persistence, defendant could have terminated the interview and secured a ride back to work, she could have done so only if she decided not to wait for her son. As a practical matter, defendant could not leave until her son arrived. By failing to terminate the interview upon defendant's request and by creating a situation that required defendant to remain at police headquarters, the detectives undermined their earlier representation that she was "free to leave."

Other evidence combined with that restriction to make the circumstances compelling. After Newell had given

defendant additional "information," she rose, exclaimed "why don't you take me out and hang me[,]" left the interview room, and walked outside to the smoking area. Newell followed her to the smoking area, and Wright soon joined him, thus continuing the interview and preventing her from suspending it by leaving the room.[7] Once in the smoking area, Newell heightened the intensity of the inquiry by putting questions to defendant that assumed her guilt.[8] He told her that "it was real important to tell [the detectives] why she had killed her husband." Defendant again expressed a desire, albeit obliquely, to discontinue the interview, stating, "I don't have any friends to talk to and I don't know any attorneys. I just want to spend time with [my son]." Again, her request was not granted. Newell told her that he was worried that she would hurt herself or her son "because of this whole thing coming to light," and suggested a "compromise," stating, "Why don't we end this nightmare now, and then you can talk to your son." Instead of suspending the interview after defendant's request, Newell pressed her once again to admit her guilt by asking, "Did he deserve that?"

By that time, defendant had spent five to six hours at police headquarters. She had asked to suspend the interview twice, both times without success. For all practical purposes she could not leave police headquarters, both detectives had followed her as she sought to leave the interview room for a break, and Newell had continued to press defendant by asking questions that assumed her guilt. Considering all the above, we conclude that, at the point Newell asked defendant, "Did he deserve that," the detectives had created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract. Because the circumstances then became compelling and because the detectives failed to advise defendant of her *Miranda* rights, all defendant's statements after Newell asked her, "Did he deserve that," should

---

[7] In *Smith*, this court concluded that a defendant was not "in custody" for the purposes of the Fifth Amendment to the United States Constitution, in part, because the defendant could have terminated his interview with police by leaving the room. 310 Or at 9. We also deem that consideration relevant to the inquiry here—that is, whether defendant's circumstances were compelling for the purposes of Article I, section 12.

[8] *See Miranda*, 384 US at 455 (noting that "[t]he aura of confidence in [a defendant's] guilt undermines his [or her] will to resist").

have been suppressed. The trial court and the Court of Appeals erred in concluding otherwise.[9]

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded for further proceedings.

---

[9] As noted above, defendant advances other arguments on review to suppress her statements at an earlier point. She argues that the detectives failed to give her *Miranda* warnings, as required under the federal constitution. The federal constitution, however, did not require *Miranda* warnings at an earlier point. *See Miranda*, 384 US at 444 (requiring *Miranda* warnings before questioning when person has been "taken into custody"). She also argues that her statements to the detectives were involuntary, in violation of ORS 136.425(1) (providing that a statement is involuntary if "made under the influence of fear produced by threats"); the Oregon Constitution, *see State v. Stevens*, 311 Or 119, 132 n 9, 806 P2d 92 (1991) (stating that a confession is involuntary if it is "procured by any threat or promise, direct or implied"); and the United States Constitution, *see Schneckloth v. Bustamonte*, 412 US 218, 225-26, 93 S Ct 2041, 36 L Ed 2d 854 (1973) (stating that a confession is involuntary if the defendant's "will has been overborne and his capacity for self-determination critically impaired"). Defendant's claim that her statements were involuntary has no merit.