Submitted January 26, affirmed June 15, petition for review denied
October 20, 2016 (360 Or 465)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## XAVIER CATELAN WOLFGANG,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR120205; A156467

379 P3d 759

Peter Gartlan, Chief Defender, and Erica Herb, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Jamie K. Contreras, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## GARRETT, J.

Defendant appeals a judgment of conviction for murder, ORS 163.115, and first-degree assault, ORS 163.185.[1] On appeal, defendant assigns error to (1) the trial court's denial of his motion to suppress statements to police that defendant asserts were involuntary and violated his constitutional rights against compelled self-incrimination, and (2) the court's imposition of a partially consecutive sentence on the assault conviction. We conclude that the trial court did not err in either respect and, accordingly, affirm.

Defendant was employed as a caretaker on the victim's property and lived on the premises in one of the outbuildings. In April 2012, deputies conducted a welfare check on the victim that included a search of his property. During the search, Deputy Schwartz found the victim dead on the floor of the barn. The deputies arrested defendant, advised him of his *Miranda* rights, and placed him in a patrol vehicle. Once inside the vehicle, defendant informed deputies that he has a hypoglycemia problem and sometimes passes out as a result. The deputies gave him some peanuts and water and transported him to the sheriff's office.

At the office, the detectives gave defendant food and water, advised him again of his *Miranda* rights, and began questioning him after defendant confirmed that he understood those rights. Among the things that defendant said was that he had seen the victim leave with three men in suits and that he heard one guy ask, "Where's our money?" Defendant also said that the victim was "wanted by his Jewish family" and "owes the Federal Government over a hundred grand." When the detectives explained that they needed to eliminate defendant from consideration in the investigation, defendant replied, "You're not shooting me?"

The interrogation continued until approximately 3:30 a.m., at which time the detectives told defendant that he was free to leave but "welcome to stay here for the next couple of hours or so." Defendant responded that it would be

---

[1] Defendant was also convicted of second-degree abuse of a corpse, ORS 166.085, and unauthorized use of a motor vehicle, ORS 164.135. Those convictions are not at issue on appeal.

a long walk back to where he lived. The detectives explained to defendant that he could not return to the victim's property, but he could stay in the interview room to get some sleep. They also explained that the door to the interview room would be locked due to the secure nature of the station, but they would be able to hear him if he needed anything.

The detectives left defendant alone until approximately 8:30 a.m., when they told him that "some things changed" and that he was no longer free to leave. They advised him again of his *Miranda* rights, defendant again acknowledged that he understood those rights, and the interrogation resumed. One of the detectives then stated:

> "Well, I want you to try and rebuild that with me by kind of telling me what's happening. Okay. We're here now. *Nothing's going to happen to you, okay. Nothing's going to happen to you at all.* So what we need to do now is going to build this rapport back up, okay. And part of doing that is you explaining not this silliness, not his ridiculousness about this far-fetched—these guys in these uniforms and whatnot, actually what happened that day, the argument, the yelling, all of it. The out of control, the—everything that happened at that point."

(Emphasis added.) As the interrogation continued, detectives also made statements asserting that defendant was withholding information, that the police knew that he was responsible for the victim's death, and that defendant's story was just "not jiving."

Defendant confessed to killing the victim inside his home by striking him repeatedly in the head with a piece of wood, then relocating the victim's body to the barn. Following the confession, defendant agreed to do a video-recorded walk-through of the victim's property. Defendant then walked detectives around the crime scene and explained how he had killed the victim and moved the body.

Before trial, defendant moved to suppress his statements to police during the interrogation and subsequent walk-through on the grounds that they were involuntary and obtained in violation of his rights against compelled self-incrimination under Article I, section 12, of the Oregon

Constitution and the Fifth Amendment to the United States Constitution. Specifically, defendant's written motion argued:

> "The officers were awar[e] prior to taking him into custody that he had a hypoglycemia problem, because he told them that, and they found him passed out. They knew he was vulnerable.
>
> "Here, there was not only a coercive atmosphere, but the interrogation was such that [defendant's] capacity for self-determination was critically impaired, and even further damaged by the interrogation techniques used. [Defendant] was told that he was withholding information, that the police knew that he was responsible, that 'it just did not add up' and that he needed to come clean (referred to as minimization), and interrogating [defendant] when he was traumatized and tired and sick."

According to defendant, those were "all classic interrogation techniques used by the police in obtaining false confessions."

At a hearing on the motion, defendant reiterated that, during the interrogation, his "capacity was impaired in two ways"—first, by being "under a great deal of stress and fear," and second, a "physical incapacity due to his physical condition." He asserted that, as a result, his statements to police were "unreliable" and "involuntary" because of his "physical, emotional and mental impairment."

The trial court denied defendant's motion:

> "[T]he chain of events that's most central to the Court's ruling are those interactions with the police starting with the point where he was advised of his rights well before he needed to be and repeatedly so.
>
> "He repeatedly acknowledged that he understood those rights. He repeatedly chose to proceed with questions. There was no show of force. There was nothing on the conduct of the law enforcement agencies that would tend to override his ability to freely and voluntarily respond to those questions.
>
> "Some of the factors cited by [defense counsel] * * * may have been present in some degree but not to the point that it would again interfere with the—his ability to understand where he was, what he was doing, what his rights were and

to freely and voluntarily respond to questions. He was even at times eager to respond to questions.

"So I conclude that the statements were all preceded by advice of rights that were delivered in an understandable way, that the Defendant expressed that he understood those, and that he was willing to answer questions further.

"There's nothing about the conduct of the police or the circumstances that would suggest that those statements, whether they were true or false, whether any of the statements were not anything but voluntarily made to the police."

On appeal, in assigning error to the trial court's ruling, defendant continues to argue that his statements to detectives during the interrogation and walk-through of the property were involuntary. Defendant's theory, however, has changed. Defendant now principally argues that his statements were induced by an implied promise of leniency or immunity. The state argues that that argument is not preserved for our review. As explained below, we agree.

Article I, section 12, provides, in part, that no person may be "compelled in any criminal prosecution to testify against himself." The state has the burden to prove, by a preponderance of the evidence, that any admissions or confessions were made voluntarily. *See, e.g., State v. Stevens*, 311 Or 119, 135-37, 806 P2d 92 (1991). "A defendant's admissions may be suppressed as involuntary either because they were the product of coercion or because the defendant's *Miranda* rights were violated." *State v. Gable*, 127 Or App 320, 324, 873 P2d 351, *rev den*, 319 Or 274 (1994)). Here, defendant argues that his confession was coerced; he does not identify a *Miranda* violation.

The test for voluntariness is "whether, under the totality of the circumstances, the waiver of rights and the confession were the product of an essentially free, unconstrained and informed choice or whether the [defendant's] capacity for self-determination was critically impaired." *State v. Burks*, 107 Or App 588, 592, 813 P2d 1071, *rev den*, 312 Or 151 (1991). Threats, promises, inducements, and similar overreaching by the police are "an essential predicate of a challenge to the admissibility of a statement or a

confession as involuntary." *State ex rel Juv. Dept. v. Deford,* 177 Or App 555, 569, 572, 34 P3d 673 (2001). "[I]n the absence of police overreaching, challenges to the voluntariness of a defendant's statements or confessions have consistently failed." *State v. Tanner,* 236 Or App 423, 431, 236 P3d 775 (2010).

In reviewing a trial court's decision regarding the voluntariness of defendant's statements, "we are bound by the trial court's findings of historical fact, but must assess independently the ultimate legal determination of voluntariness." *State v. Acremant,* 338 Or 302, 324, 108 P3d 1139, *cert den,* 546 US 864 (2005). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993).

As noted, defendant's appellate argument challenging the voluntariness of his confession rests largely on his claim that the interrogating officer's statement—"Nothing's going to happen to you, okay. Nothing's going to happen to you at all"—was a promise of leniency or immunity. The state objects that that argument was not made to the trial court.

Ordinarily, claims of error that were not raised at the trial court will not be considered on appeal because of the policies in favor of preservation. *State v. Walker,* 350 Or 540, 548, 258 P3d 1228 (2011). To preserve an error, a party "must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt,* 331 Or 335, 343, 15 P3d 22 (2000). Arguments on appeal will be deemed unpreserved if they present "discrete legal theories" that "could, and should, have been raised below." *State v. Amaya,* 336 Or 616, 629, 89 P3d 1163 (2004).

Although defendant generally preserved his argument that his confession was involuntary, defendant never argued below that his confession was induced by a promise

of leniency or immunity. Rather, defendant's written motion argued that detectives exploited defendant's impairment due to his hypoglycemic condition using techniques other than a promise of immunity, and, at the hearing, defendant's arguments focused entirely on defendant's physical impairment due to being hypoglycemic, his mental and emotional impairment as a result of being "under stress," and the coercive "atmosphere" of the interrogation. Neither argument pointed to the detectives' assurance that "nothing" was going to happen to defendant.

The theory that police made a promise of leniency or immunity raises distinct questions to which neither the prosecution nor the trial court were alerted and as to which the record would likely have developed differently if defendant had pursued that argument below. As defendant's own brief on appeal points out, courts apply a particular analytical framework to determine whether a promise of immunity or leniency negates voluntariness:

> "To conclude that a defendant's will was overborne or that his capacity for self-determination was impaired by a promise of leniency requires findings that the defendant understood that there was, in fact, a promise of leniency, that the defendant's understanding to that effect was reasonable, that the defendant actually relied on that promise in confessing and that the defendant was reasonable in doing so."

*State v. Marshall*, 254 Or App 419, 429-30, 295 P3d 128 (2013) (quoting *State v. Goree*, 151 Or App 621, 632, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998)) (internal quotation marks omitted). Although defendant argued below that he lacked the "capacity for self-determination" at the time of his confession, he attributed that incapacity solely to his hypoglycemic condition and to the "stress" associated with the coercive atmosphere at the police station. Defendant at no time argued that he had been offered or promised leniency, immunity, or any other inducement. As a result, the trial court did not make the findings described in *Marshall*, was not asked to, and would not have understood such findings to be invited by defendant's arguments. Accordingly, we conclude that defendant's first assignment of error is not preserved to the extent that his involuntariness argument is based upon a promise of leniency or immunity.

In addition to defendant's unpreserved promise-of-leniency argument, defendant contends that his statements were involuntary because of the purported coercion inherent in the length of time that he was in police custody and in the fact that, despite being told at 3:30 a.m. that he was free to leave, "for all practical purposes, he could not have left because he had no place to go and no form of transportation."

Defendant's argument fails. The trial court cited evidence that defendant "was advised of his rights well before he needed to be and repeatedly so," and that defendant "repeatedly acknowledged that he understood those rights. He repeatedly chose to proceed with questions." Defendant's reliance on *State v. Roble-Baker*, 340 Or 631, 136 P3d 22 (2006), is unavailing. In that case, which involved a defendant who was *not* Mirandized, the Supreme Court held that the defendant's statements should have been suppressed in part because the defendant's practical inability to leave the police station contributed to compelling circumstances such that *Miranda* warnings were required. *Id.* at 642-43. This case involves the distinct legal context of a custodial interrogation in which *Miranda* warnings *were* given and acknowledged multiple times. In the middle of that interrogation, the detectives offered defendant an opportunity to rest. Defendant cites no authority for the proposition that they were instead obliged to give him a ride to a location of his choice.

In short, the trial court found that defendant's statements to police were "all preceded by advice of rights that were delivered in an understandable way, that the Defendant expressed that he understood those, and that he was willing to answer questions further." The record supports those findings, and also reflects that police acknowledged defendant's health concern, supplied him with food and water, and gave him several hours to sleep. Nor has defendant cited any evidence that police were unduly aggressive or threatening in their questioning. In short, defendant has simply not identified any of the type of "overreaching" by police that could support a conclusion that his statements were obtained by

coercion. *Tanner*, 236 Or App at 431; *Deford*, 177 Or App at 572.

For the foregoing reasons, we conclude that the trial court correctly ruled that defendant's waiver of his *Miranda* rights and his subsequent statements to police during the interrogation and walk-through of the victim's property were voluntarily made. Thus, the trial court did not err when it denied defendant's motion to suppress.

We next address defendant's second assignment of error, which asserts that the trial court erred when it imposed a partially consecutive sentence for first-degree assault. We begin with several additional pertinent facts. The evidence in the record is that defendant and the victim got into an argument inside the victim's home, which escalated into a physical altercation. Defendant struck the victim in the head with a piece of wood, then defendant left the house for a period of approximately 10 to 15 minutes. During that time, a Yamhill County wastewater inspector arrived at the property, defendant told her that he needed to reschedule the inspection, and then defendant retreated to his living quarters to play with his cats. Defendant returned to the victim's house, found him still alive, and struck him several more times in the head with a piece of wood until the victim stopped moving.

The trial court found that the assault and the murder were separated in time, initially in the context of concluding that the two offenses did not merge:

"[T]he chain of events support that there really were two assaults in a sense. There was an assault where [the victim] was left on the floor in the house. Defendant left for a period of time, seemed to do other, almost kind of mundane things, came back and administered a second assault.

"There was actually a completed assault, time for the Defendant to reflect, reform a state of mind and intent, all those factors under the law, as well as logic and under the facts of the case lead the Court to conclude those two offenses do not merge."

The court later referred back to those findings when address-ing whether the sentences for assault and murder should run consecutively or concurrently:

> "But I do think that the assault 1 and the murder were so related, even though I have found they were separate crimes and separated by some period of time, that I think it would be inappropriate for the Court to make them com-pletely consecutive. And yet, by the same reasoning as I found them to be separate crimes, I think it would be inap-propriate to make it completely concurrent."

The court sentenced defendant on the murder conviction to the 300-month mandatory minimum sentence under ORS 137.700(2)(a)(A). With respect to the assault conviction, the court sentenced defendant to the 90-month mandatory min-imum under ORS 137.700(2)(a)(F) with 30 months to run concurrent with the first sentence and 60 months to run consecutive to it. We understand the trial court's imposition of a partially consecutive sentence to have been based on a finding that defendant's activities were not part of "the same continuous and uninterrupted course of conduct" under ORS 137.123(2). Defendant argues that the trial court erred when it imposed a partially consecutive sentence because the murder and the assault were part of the same "criminal episode."

ORS 137.123 provides, in relevant part:

> "(2) If a defendant is simultaneously sentenced for criminal offenses that do not arise from the same contin-uous and uninterrupted course of conduct, or if the defen-dant previously was sentenced by any other court within the United States to a sentence which the defendant has not yet completed, the court may impose a sentence concur-rent with or consecutive to the other sentence or sentences.

> "* * * * *

> "(4) When a defendant has been found guilty of more than one criminal offense arising out of a continuous and uninterrupted course of conduct, the sentences imposed for each resulting conviction shall be concurrent unless the court complies with the procedures set forth in subsection (5) of this section.

"(5) The court has discretion to impose consecutive terms of imprisonment for separate convictions arising out of a continuous and uninterrupted course of conduct only if the court finds:

"(a) That the criminal offense for which a consecutive sentence is contemplated was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense; or

"(b) The criminal offense for which a consecutive sentence is contemplated caused or created a risk of causing greater or qualitatively different loss, injury or harm to the victim or caused or created a risk of causing loss, injury or harm to a different victim than was caused or threatened by the other offense or offenses committed during a continuous and uninterrupted course of conduct."

Thus, if the trial court finds that the offenses that gave rise to multiple convictions did not occur as part of the "same continuous and uninterrupted course of conduct," the trial court may impose consecutive sentences. ORS 137.123(2). If, however, the offenses did arise from a "continuous and uninterrupted course of conduct," ORS 137.123(4) provides for concurrent sentences unless the trial court follows the procedures in ORS 137.123(5). "There is nothing in the language of [ORS 137.123] that limits the court in the exercise of its discretion from imposing partially consecutive sentences and concurrent sentences." *State v. Trice*, 159 Or App 1, 4-5, 976 P2d 569, *rev den*, 329 Or 61 (1999). On appeal, we review "whether there is evidence to support the trial court's findings" and review the court's application of ORS 137.123(2) for legal error. *State v. Warren*, 168 Or App 1, 5, 5 P3d 1115, *rev den*, 330 Or 412 (2000).

Defendant's argument is that his assault and murder of the victim were part of the same "criminal episode" and that the trial court was therefore prohibited from imposing sentences that were not wholly concurrent. Defendant is incorrect.

As an initial matter, the state challenges defendant's reliance on the concept of a "criminal episode." As the state points out, the term "criminal episode" does not appear in

ORS 137.123, which instead uses the language "continuous and uninterrupted course of conduct." Defendant's reference to "criminal episode" comes from a different statute, ORS 131.505(4), which defines "criminal episode" for purposes of double jeopardy as "continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective."

Although that statute pertains to double jeopardy, the ORS 131.505(4) definition of "criminal episode" has at times been used interchangeably with ORS 137.123(2)'s reference to "same continuous and uninterrupted course of conduct." *See State v. Crotsley*, 308 Or 272, 277 n 5, 779 P2d 600 (1989); *State v. Kautz*, 179 Or App 458, 465-66, 39 P3d 937, *rev den*, 334 Or 327 (2002). The state acknowledges that line of cases but argues that (1) our cases do not actually import the definition from ORS 131.505(4) into ORS 137.123(2) and (2) to the extent that they do, their reasoning is incorrect and should be disavowed because ORS 137.123(2) simply does not include the additional qualifying language found in ORS 131.505(4) (that a "criminal episode" is "so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective").

It is unnecessary to further address the state's contention that the definition of "criminal episode" in ORS 131.505(4) is irrelevant to the imposition of consecutive sentences under ORS 137.123(2), because, even if defendant is correct that that definition is controlling, defendant's argument on appeal fails. That is so because the trial court's findings support the conclusion that defendant engaged in more than one criminal episode under the ORS 131.505(4) definition.

For multiple crimes to constitute one criminal episode, the conduct must be (1) "continuous and uninterrupted" and (2) "directed to the accomplishment of a single criminal objective." *State v. Tooley*, 265 Or App 30, 39, 333 P3d 348, *rev den*, 356 Or 575 (2014). Defendant argues that the two beatings, separated in time by, at most, 15 minutes, were directed towards a single criminal objective: to incapacitate the victim. Defendant's focus on the singularity of the

criminal objective, however, ignores the trial court's finding that the conduct was not "continuous and uninterrupted." Specifically, the court found that defendant had enough time in between the two crimes to "do other, almost kind of mundane things" and then to "reflect, reform a state of mind and intent" before he "came back and administered a second assault." The trial court's finding is supported by evidence in the record and is sufficient to support an imposition of a partially consecutive sentence under the language of either ORS 131.505(4) or ORS 137.123(2). Accordingly, the trial court did not err.

Affirmed.