560 September 24, 2025 No. 829

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT MICHAEL THOMAS,
*Defendant-Appellant.*

Washington County Circuit Court
21CR56337; A182102

Oscar Garcia, Judge.

Argued and submitted August 22, 2025.

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. On the brief were Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Conviction on Count 1 reversed and remanded; otherwise affirmed.

**KAMINS, J.**

Defendant was convicted of first-degree sexual abuse, ORS 163.427, following a bench trial. He appeals the judgment of conviction, raising three assignments of error; we address the first because it is dispositive. In that assignment, defendant argues that certain statements he made to police officers in compelling circumstances were obtained in violation of his rights under Article I, section 12, of the Oregon Constitution.[1] We agree and, because the error was not harmless, reverse and remand.

"We state the historical facts consistently with the trial court's findings that are supported by sufficient evidence in the record; we presume that the trial court resolved disputed facts consistently with its express factual findings and its ruling." *State v. Grimm*, 290 Or App 173, 174, 414 P3d 435, *rev den*, 363 Or 283 (2018). Whether the circumstances surrounding a police interview are compelling is inherently fact dependent; we thus describe the facts here in some detail.

In 2021, a detective from the Hillsboro Police Department, Schwartz, attempted to speak with defendant regarding sexual abuse allegations that had been brought against him by his adopted daughter, O. Schwartz first visited defendant's home, where she was told by defendant's then-girlfriend that he was not there. Schwartz then contacted defendant by phone. Schwartz told defendant about the sexual abuse allegations and said, "I'd like to set a time for us to meet." Defendant indicated that he was aware of the allegations and agreed to meet at the Hillsboro Police Department the next day.

Defendant arrived on his own the next day and was met in the parking lot by Schwartz and another police officer, Schriner. Defendant was asked—and agreed—to leave his Leatherman in his car, then consented to a patdown to ensure that no other weapons remained on his person. Due to COVID-19 restrictions, the police department building was locked from the outside and the detectives had to escort defendant in. The detectives then led defendant inside the

---

[1] Defendant does not pursue any argument under the federal constitution.

police station to an interview room where he was read his *Miranda* rights. Defendant was notified that the interview was being recorded by audio and video. Defendant was also told that the exit doors were unlocked from the inside, and that he could stop the interview and leave at any time. Defendant acknowledged that he understood.

Schwartz began the interview by asking defendant what his understanding was about the allegations against him. Defendant explained that he was aware that O accused him of molesting her and vehemently denied that that had occurred. Schwartz asked defendant why O would make that up, and defendant shared that he believed that O was jealous of the attention her sister, N, received. The conversation then turned to what another sister, K, might have seen in the house, and defendant attempted to end that topic of conversation:

"DET. SCHWARTZ: (Indiscernible) [K] might have seen something?

"[DEFENDANT]: Maybe. You'd have to ask her what she saw.

"DET. SCHWARTZ: Okay. Well, I'm asking you.

"[DEFENDANT]: I don't know what she saw.

"So, what I'm getting at here is this is a parenting thing. And I'm not going to get hung out for what is deemed maybe unacceptable parenting.

"And that's all I'm going to say about that.

"What I will tell you is the predator in the group is not me. The predator is [O]."

Later in the interview, Schwartz tried to bring up an email exchange between O and defendant. In that exchange, O sent defendant an email in which O laid out her allegations against him, and defendant made certain admissions to touching O's breasts. Defendant again tried to end the conversation, but Schwartz persisted in asking defendant about the emails:

"DET. SCHWARTZ: So did you—so she sends you an e-mail. So, what does it say?

"[DEFENDANT]: I told you. That's—we'll talk about that some other time.

"DET. SCHWARTZ: Okay. So, what—you respond to the e-mail?

"[DEFENDANT]: No. She said she didn't want to talk to me.

"DET. SCHWARTZ: You never responded to the e-mail?

"[DEFENDANT]: No. Not right away.

"DET. SCHWARTZ: Okay. (Indiscernible).

"[DEFENDANT]: Yeah.

"DET. SCHWARTZ: Did you respond to the e-mail?

"[DEFENDANT]: Yes.

"DET. SCHWARTZ: Okay. What did you say?

"[DEFENDANT]: So I'm not willing—I'm not going to answer that question.

"DET. SCHWARTZ: Okay. But that's why we're here, though."

Defendant went on to talk about issues he and his wife had with O living with them. Schwartz then changed the subject and brought up the email again, saying she wanted defendant to tell her why he "did the things that [he] did."

"[DET. SCHWARTZ]: So, [O] is saying that you touched her. You're saying no, that that's not true, but you're saying—I have the e-mail.

"[DEFENDANT]: You have the e-mail?

"DET. SCHWARTZ: Yes.

"[DEFENDANT]: Okay. Well, then why did you ask me if I responded?

"DET. SCHWARTZ: I want to know if you're going to be truthful.

"[DEFENDANT]: Oh, okay.

"* * * * *

"[DET. SCHWARTZ:]   And so this is your opportunity to help us understand, like, I mean, why you did the things that you did."

At points throughout the interview, the detectives would ask a question and defendant would refuse to answer due to not knowing the illegality of what he would be admitting to:

"[DEFENDANT:]   But—see, here's the thing. I don't know if how I touched her is illegal or not.

"* * * * *

"And I am not going to sit here and say I did anything without asking somebody who will tell me the truth whether or not that was illegal as a parent.

"DET. SCHWARTZ:   Okay. Well, how did you—I mean, I guess, she is saying that you touched her breasts on multiple times.

"So, I guess, I would—we'd have to get into the nuts and bolts of, well, how did you touch her breast and in what way did you touch her breast, in what context. What's going on for—would it be appropriate for an adoptive father to—

"[DEFENDANT]:   Hm-mm.

"DET. SCHWARTZ:   —touch a young girl's developed breast? So, that's kind of—I mean, I can't give you legal advice, but a detective is assigned to this case.

"* * * * *

"[S]o did you touch her breast over her clothes or under her clothes?

"[DEFENDANT]:   I can't answer that until I know if I'm hanging myself or not."

At no point did the police officers attempt to clarify whether defendant was asking for a lawyer. After his initial refusals to answer, defendant continued to participate in the interview where he ultimately admitted to touching O's breasts over and under her clothes seven times for the purposes of teaching her when to say "no" to inappropriate touching. Defendant was charged by indictment with two counts of first-degree sexual abuse, one of which was later dismissed on the state's motion.

Defendant waived his right to a trial by jury. At a pretrial hearing, the state, on its own initiative, brought up the fact that defendant's statements implicated *Miranda* issues. Defendant did not make a motion to suppress the statements, but argued, in essence, that defendant was in compelling circumstances at the time the statements were made. The court disagreed with defendant, stating, "It's pretty clear that [the interview] was non-custody, no compelling circumstances, and that's the current case law." The court ultimately found defendant guilty.

On appeal, defendant argues that the trial court erred when it ruled that there were no compelling circumstances because the interview was police-dominated. He contends that the moments during the interview where he refused to answer questions without knowing the illegality of his actions were, at minimum, equivocal invocations of his right to counsel, and officers failed to ask follow-up questions to clarify his request, thus making any subsequent statements inadmissible. The state, for its part, argues that defendant was never under compelling circumstances because the location, length of interview, and pressure exerted from detectives did not amount to compelling circumstances. We recognize that this is a close case; however, for the reasons that follow, we agree with defendant.

We begin by explaining the relevant constitutional framework. Article I, section 12, protects an individual's right against compelled self-incrimination. *State v. Revette*, 318 Or App 749, 758, 508 P3d 985, *rev den*, 370 Or 214 (2022). Nestled within that protection are the familiar rights "to remain silent and a 'derivative or adjunct right to have the advice of counsel in responding to police questioning.'" *State v. Ward*, 367 Or 188, 190-91, 475 P3d 420 (2020) (quoting *State v. Turnidge (S059155)*, 359 Or 364, 399, 374 P3d 853 (2016)). "As part of the constitutional guarantee, if a person in custody or other similarly compelling circumstances unequivocally invokes one of the rights guaranteed by Article I, section 12, * * * then 'police must honor that request and stop questioning.'" *Id.* (quoting *State v. McAnulty*, 356 Or 432, 455, 338 P3d 653 (2014)). In a similar vein, if a person in compelling circumstances makes an ambiguous or equivocal invocation of their *Miranda* rights,

"the police are required to ask follow-up questions to clarify what the person meant before proceeding with interrogation." *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014) (citing *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996)). The remedy for a violation of Article I, section 12, is suppression. *See State v. Vondehn*, 348 Or 462, 475-76, 236 P3d 691 (2010) ("When the police violate Article I, section 12, *** the state is precluded from using evidence derived from that violation to obtain a criminal conviction.").

The parties agree that the case turns on whether defendant was in compelling circumstances during the interview because defendant made several equivocal invocations over the course of his interview.[2] "[W]hether the circumstances were compelling does not turn on either the officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood his or her situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007). "We consider the following non-exclusive factors in making that determination: (1) the location of the encounter, (2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter." *State v. Andrews*, 335 Or App 59, 67, 557 P3d 165 (2024) (citing *State v. Roble-Baker*, 340 Or 631, 640-41, 136 P3d 22 (2006)). In applying the factors, we look at the totality of the circumstances and our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641.[3] We address each of those factors in turn.

_____

[2] The state does not argue on appeal that defendant's statements were not equivocal invocations of his rights, and the state concedes that it did not make that argument below. At oral argument before us, the state took the position that we should "assume for purposes of its analysis" that defendant's statements were equivocal invocations. Given that framing, we assume for purposes of this opinion that defendant's statements amounted to equivocal invocations of defendant's rights to counsel and to remain silent. Any statements that follow an invocation must be suppressed. *State v. Rose*, 296 Or App 99, 108, 437 P3d 1144 (2019) (concluding that a trial court committed reversible error in not suppressing statements made after the defendant's equivocal invocation when "detectives failed to clarify [the] defendant's statement before proceeding further").

[3] Typically, when determining whether circumstances are compelling, it is due to the *absence* of *Miranda* warnings when police interrogate a suspect. The police here, however, read *Miranda* warnings to defendant before interviewing him. In addition, when a suspect has invoked or attempted to invoke their

*Location.* Defendant's interview took place in an interview room within a police station. Although defendant appeared voluntarily and was told how to leave, the police station remained locked to outsiders. Before entering the facility, defendant was frisked and was required to remove his Leatherman. The interview was conducted by two police officers with firearms. This factor "slightly favors" defendant. *See Andrews*, 335 Or App at 67 (noting that location of interview, a small office within a police station, made it "a police-dominated atmosphere" that "slightly favor[ed]" compelling circumstances); *Grimm*, 290 Or App at 180 (observing that "the location of the encounter, the unfamiliar, police-station setting of the interview tended—necessarily—toward a police-dominated atmosphere"); *cf. Revette*, 318 Or App 749 (no compelling circumstances when "building itself looks like a normal office building, not a typical police station"); *State v. Bush*, 203 Or App 605, 611, 126 P3d 705 (2006) (no compelling circumstances when record lacked "evidence that defendant was physically restrained, frisked, or even touched before or during the period in which he was questioned"); *but see Andrews*, 335 Or App at 67 (noting that "a defendant who voluntarily comes to a station for an interview on his own power 'lessened somewhat' the effect of the police-dominated interview location" (quoting *Grimm*, 290 Or App at 180)).

In arguing otherwise, the state relies on *State v. Barber*, 179 Or App 674, 679, 41 P3d 455, *rev den*, 334 Or 632 (2002), a police station interview case in which we held that there were no compelling circumstances, in part, because the defendant—a 19-year-old with intellectual disabilities—voluntarily came to the interview and did not indicate that he wanted to leave. That case is unpersuasive for several reasons. First, the defendant in *Barber* was accompanied to the police station by his father, who waited outside the police interview room. *Id.* at 676. Defendant here came to his interview alone, making him more susceptible to a police-dominated environment. In addition, *Barber* was decided prior to *Roble-Baker*, using a different analytical

---

*Miranda* rights, our role typically has been to determine whether their words amounted to an invocation—*not* whether the circumstances under which they invoked was compelling or not.

framework, and failed to analyze several of the relevant factors, including the amount of pressure exerted on the defendant. *Id.* at 679. Finally, the fact that the defendant in *Barber* was intellectually disabled did not weigh heavily in the analysis, suggesting that the outcome might have been different if that case were decided today. *See State v. Jackson*, 364 Or 1, 30, 430 P3d 1067 (2018) (noting that, in the context of voluntariness of confessions, "a defendant's mental condition is a factor that *must* be considered, as part of the totality of the circumstances" (emphasis added)).

*Length.* The length of the interview was approximately 50 minutes, with defendant's attempted invocations occurring approximately 13 minutes into the conversation. That factor favors the state. *See Grimm*, 290 Or App at 180 (one and one-half hour interview "would not, considered in isolation, compel a conclusion" of compelling circumstances).

*Pressure Exerted.* With regard to the amount of pressure exerted on defendant, this factor also leans toward defendant. Defendant told officers that he did not want to talk about the emails between him and O that discussed his conduct when O was living in his house, in what the state conceded below was an equivocal invocation of his right to remain silent as to that subject. In the face of that request, Schwartz immediately pressed on with her questioning and continued to ask defendant, repeatedly, if he had responded to O's email. After defendant responded that he was "not going to answer" questions about the email and its contents, Schwartz continued applying pressure on defendant to speak, by saying, "Okay. But that's why we're here, though." Similarly, when defendant later made statements that could be interpreted as an invocation of his right to speak with an attorney, Schwartz did not attempt to clarify defendant's request, but instead responded that a detective was assigned to defendant's case.

This was not a situation where the police merely "asked defendant for his side of the story," *Grimm*, 290 Or App at 183; rather, Schwartz said to defendant, "[S]o this is your opportunity to help us understand, like, I mean, why you *did* the things that you *did*." (Emphases added.) By framing the question in that way—assuming that

defendant *did* those acts—Schwartz was pressuring defendant for more information in a way that already "implicitly assumed" that he was guilty of the act—*i.e.*, that defendant had committed the acts in question. *See id.* at 184 (police tactics that "implicitly assumed" the defendant's guilt went beyond a "brief and noncoercive use of incriminating evidence * * * and instead were calculated to contradict defendant's repeated assertions of innocence and pressure him to continue talking"); *State v. Courville*, 276 Or App 672, 678, 368 P3d 838 (2016) (police questioning that "projects an 'aura of confidence' in the suspect's guilt—'undermines [the suspect's] will to resist' answering questions" (quoting *Miranda v. Arizona*, 384 US 436, 455, 86 S Ct 1602, 16 L Ed 2d 694 (1966) (brackets in *Courville*))). Police officers here implied that defendant was the subject of a criminal investigation, took him to a room in a police station where he was recorded, pressured him repeatedly to talk about subjects he did not want to talk about, and asked him questions that assumed his guilt.

In addition, Schwartz later revealing to defendant that she had been testing his honesty increased the pressure exerted. At first, Schwartz asked defendant if he responded to the email and what he said in his response, which implied that she did not know the answer to those questions. As later revealed, Schwartz had defendant's email all along, and was merely asking those questions to, as she put it, see if defendant would be truthful. Schwartz explained that was "kind of how" the interrogation was going to go, and that she had "a lot of information" that she would not readily reveal to defendant. That "testing" of defendant's honesty is a tactic designed to compel a reasonable person in defendant's position to continue to answer the officer's questions. *See State v. Vasquez-Santiago*, 301 Or App 90, 113, 456 P3d 270 (2019) (noting "subtler techniques of interrogation that can be equally, if not more, effective at eroding the will"). Accordingly, this factor leans in favor of defendant.

The state, for its part, argues that the state may confront a suspect with evidence in a noncoercive and non-aggressive manner, and, in doing so, it does not create circumstances that are compelling. True enough. However,

the cases cited by the state undercut its point by emphasizing the heightened levels of coercion here. For example, in *Courville*, 276 Or App at 674, one of the cases the state relies on, the defendant and police officer already knew each other and began their conversation in the defendant's backyard, discussing different yard projects. The police then explained the specific allegations to the defendant and asked the defendant if those allegations were true. *Id.* Here, by contrast, Schwartz did not explain the allegations or incriminating evidence to defendant until several minutes into the interview, in a "gotcha" attempt to see if defendant was "going to be truthful." A reasonable person, in that situation, would feel compelled to try and explain themselves.

 *Ability to Leave.* As mentioned, defendant had the ability to terminate the encounter and leave the police station. Thus, this factor leans in favor of the state. *Cf. Roble-Baker*, 340 Or at 642 (the defendant had no practical ability to terminate police station interview when detectives had driven the defendant to the station, and she was "dependent upon them for leaving").

 Finally, we are mindful that our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641. Those warnings are not empty fluff: They are "intended to inform individuals of their right to remain silent, *assure them a continuous opportunity to exercise that right*, and warn them of the consequences of waiving it." *State v. Reed*, 371 Or 478, 485, 538 P3d 195 (2023) (emphasis added). To that end, it is significant that the officers informed defendant of his rights by reading him *Miranda* warnings, but then failed to follow through on the promise of those warnings when they did not respond at all to defendant's possible invocation of his rights. In such a case, the circumstances have become *more* compelling "because, even though defendant was informed of his right to counsel, his later attempt to invoke that right was not honored[.]" *State v. Dodge*, 297 Or App 30, 44-45, 441 P3d 599, *rev den*, 365 Or 533 (2019); *see also id.* (explaining how that may be the case); *State v. Koch*, 267 Or App 322, 332, 341 P3d 112 (2014) (when officers continued questioning the

defendant following an unequivocal invocation of the right to counsel, they likely created the impression that assertion of the right was meaningless); *cf. State v. Sparklin*, 296 Or 85, 89, 672 P2d 1182 (1983) (observing that "[w]hen the police honor" a suspect's invocation of their rights during interrogation, "the coercive atmosphere of police interrogation is to some degree dispelled"). It is not enough that a suspect merely understand that they possess those rights. *See Turnidge (S059155)*, 359 Or at 404 n 24 ("The reading of *Miranda* rights is a factor that weighs in favor of concluding that a defendant subject to police interrogation understands his or her ability to terminate questioning and to otherwise seek counsel rather than cooperate with law enforcement."). Those rights must actually be honored for their purpose to be fulfilled. *See State v. Mendacino*, 288 Or 231, 238, 603 P2d 1376 (1979) (when detectives "persist[] in questioning" after adequate *Miranda* warnings and obtain confessions, those confessions "partake more of actual coercion" and can affect voluntariness); *Ward*, 367 Or at 191 (to ensure that any waiver is both knowing and voluntary, "officers must provide a person with the so-called *Miranda* warnings * * * in part '[b]ecause a custodial interrogation is inherently compelling'" (quoting *Vondehn*, 348 Or at 474 (brackets in *Ward*))).

On balance, the police officers here "created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract": They used coercive interview tactics, conducted their interview inside a police station, and read *Miranda* warnings to defendant but failed to comply with its requirements. Defendant was placed in compelling circumstances based on the totality of the circumstances, including the location and level of coercion. The trial court erred in concluding otherwise. In addition, the error was not harmless. The primary dispute at trial was defendant's intent and O's age. During its closing, the state used defendant's statements against him to prove both disputed elements. In fact, the state emphasized defendant's statements at the beginning and throughout its closing argument. Thus, the statements had more than a little likelihood of affecting the verdict. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (explaining that a trial court error is

deemed harmless if there is little likelihood that it affected the verdict); *State v. Roller*, 201 Or App 166, 173, 118 P3d 804 (2005) ("If erroneously admitted evidence relates to a central factual issue to the case, it is more likely to have affected the determination than if it dealt with a tangential issue." (Internal quotation marks omitted.)).

Conviction on Count 1 reversed and remanded; otherwise affirmed.