Argued and submitted October 6, 2010, reversed and remanded July 13, appellant's petition for reconsideration filed July 27 allowed by opinion September 8, 2011
See 245 Or App 500, 263 P3d 1110 (2011)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DYLAN BAXTER FORD,
*Defendant-Appellant.*

Columbia County Circuit Court
086002; A142212

260 P3d 637

Andy Simrin argued the cause for appellant. With him on the brief was Andy Simrin PC.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for two counts of third-degree sexual abuse, ORS 163.415, assigning error to the trial court's denial of his motion to suppress incriminating statements that he made after he was stopped and questioned by police.[1] He argues that his statements were procured under compelling circumstances in the absence of *Miranda* warnings, in violation of Article I, section 12, of the Oregon Constitution.[2] We conclude that defendant's incriminating statements were made under compelling circumstances and that the trial court, therefore, should have granted defendant's motion to suppress. Accordingly, we reverse.

We state the facts consistently with the trial court's express and implied findings, limiting our review to the record before the court at the time it decided the motion. *State v. Saunders*, 221 Or App 116, 118, 188 P3d 449, *rev den*, 345 Or 416 (2008). At 1:05 a.m. on a cold December night, Bonds, a deputy sheriff for the Columbia County Sheriff's Office, observed a pickup truck illegally parked on the side of a rural road in a remote area. Bonds stopped his marked patrol car "about two car lengths" behind the truck in order to do "a welfare check."[3] It was dark and there were no street lights. The truck's windows were "fogged up," but Bonds could see defendant and a girl wrapped in a brown sleeping bag sitting in the middle of the front seat of the truck. They were face-to-face, "like she was sitting on his lap." Bonds turned on his spotlight and directed it into the cab. The girl's breasts were bare, and defendant was shirtless. Both occupants "were frantically moving around, putting on clothing." Bonds immediately noticed that the girl looked 15 or 16 years old, and he suspected that a sex crime had occurred. He waited a moment before approaching the vehicle to allow the occupants to dress.

---

[1] Defendant advances two other assignments of error. However, we need not address those claims, because we conclude that defendant's first assignment of error provides grounds for reversal.

[2] Article I, section 12, provides, in part, that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself."

[3] Bonds alternately described the distance between the vehicles as "30 [or] 40 feet."

Bonds was in uniform and his badge was visible. When he approached the vehicle, the window was down and defendant was sitting in the driver's seat. Defendant appeared to be over 18 years old. Both he and the girl were "out of breath and sweaty." The girl stated that she was 16 years old. Bonds requested and obtained defendant's driver's license, which indicated that he was 20 years old. Bonds ran a warrant check, which came back negative, but retained defendant's license. Bonds asked defendant why they were parked there, and defendant responded that they had stopped to "make out." The girl also stated that "they were just making out."[4]

By that time, another deputy, Hinkle, had arrived. He parked behind Bonds's patrol car and turned on his rear-facing blue and red strobe lights, which were "fairly bright."[5] Bonds left the truck for a few minutes in order to apprise Hinkle of the situation and to ask him to interview the girl. Bonds then returned to the truck and asked defendant if he would "voluntarily" exit the vehicle and accompany Bonds to the front of his patrol car. Defendant agreed.

Hinkle interviewed the girl, who remained seated in the truck, while Bonds questioned defendant at the front of his patrol car. Although Hinkle spoke to defendant on a "limited basis," he did not engage in any questioning of defendant. A third deputy, Harper, arrived sometime after Hinkle. Harper did not participate in the interviews but provided "cover" and stood "around either one of [the other deputies] or in that area." The spotlight remained on during the course of the interviews.

In response to questioning, defendant at first denied "even what [Bonds] had seen happen[ ]." Bonds continued to question defendant, but defendant was "not really forthcoming." Throughout the interview, Bonds periodically conferred

---

[4] The exact sequence of the statements is not clear. However, Bonds testified that he questioned the girl both before and after a second deputy, Hinkle, interviewed her and that, on both occasions, she stated that "they did not do anything" and that they were "just making out."

[5] The trial court's findings recognize "the possibility that blue and red flashing lights were visible on one or more of the patrol vehicles during the stop." Hinkle testified unequivocally that his rear-facing overhead lights were on throughout the stop.

with Hinkle. According to Bonds, "[t]here were several times that I would walk over to Deputy Hinkle and we'd discuss what the girl was telling him and what I was being told, see if the stories were matching." Bonds would then go "back to [defendant]" and, as the trial court found, "[tell] Defendant during the questioning that his story did not 'match' that of the alleged victim, and impl[y] that she had already accused the Defendant of facts amounting to a crime."[6] Over the course of an hour, Bonds told defendant "five or six times" that "we knew what was going on, we'd been talking to the girl, we knew, so I needed him to tell me the truth" and admonished him to "tell me exactly what happened."

After the fifth or sixth attempt by Bonds to elicit more information, defendant made incriminating statements. Bonds then cited defendant and, as he did so, "allowed [defendant] to sit in his vehicle" because defendant had said that he was cold. At no point during the 60-minute encounter was defendant given *Miranda* warnings. Moreover, as Bonds testified and the trial court found, defendant was not free to leave until he had been cited and his license was returned.

Defendant was charged with two counts of third-degree sexual abuse. Prior to trial, he moved to suppress the incriminating statements that he made during the encounter with police. He argued that, among other things, the circumstances became compelling during the course of the stop and that, because the police had failed to administer *Miranda* warnings, his statements were obtained in violation of Article I, section 12. After a hearing on the matter, the trial court denied defendant's motion to suppress. The court reasoned that, although defendant was not free to leave during the encounter, the "implications made by Deputy Bonds to the Defendant, regarding the alleged victim's statements, do not appear to be any more coercive than those in [*State v. Shaff*, 343 Or 639, 175 P3d 454 (2007)]." Consequently, the court concluded that "the stop and ensuing investigation did

---

[6] Bonds testified, "I basically told him that we knew what was going on and that the other deputy was talking to the girl and he needed to tell me what actually happened, that I didn't believe that they just had their shirts off, I saw more than that." Bonds confirmed that his statements were calculated to imply that defendant had engaged in more sexual activity than what he acknowledged.

not ever rise to the level of circumstances sufficiently compelling to require suppression of Defendant's statements." Defendant was subsequently convicted of two counts of sexual abuse in the third degree.

On appeal, defendant renews his contention that the circumstances of the stop were compelling and points to several facts in support of that argument: the questioning took place late at night on a secluded road; a spotlight, as well as blue and red flashing lights, remained on throughout the stop; the encounter lasted an hour, during which defendant was outside in the cold weather; defendant was unable to terminate the encounter; the deputy exerted at least some control over defendant's movement when he asked defendant to stand at the front of the patrol car and when he later "allowed" defendant to return to the truck; and defendant was repeatedly pressured to divulge more information until he ultimately relented and did so. The state responds that a reasonable person would not have felt compelled to answer the deputy's questions under the circumstances: the questioning took place on a public road; the interview was a one-on-one exchange; the duration of the stop was reasonable; and the deputy used no coercive tactics and made no show of force.

To protect a person's right against compelled self-incrimination under Article, section 12, "before questioning, police must give *Miranda* warnings to a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (citations and internal quotation marks omitted). Whether a defendant was in compelling circumstances "turns on how a reasonable person in the [defendant's] position would have understood his or her situation." *Shaff*, 343 Or at 645. In making that determination, a number of considerations may be relevant: "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter." *Roble-Baker*, 340 Or at 640-41 (citations omitted). Other factors that we have considered include "the number of officers and police cars at the scene, the demeanor of

the investigating officer, and the use of physical force or confinement during questioning." *State v. Nunez*, 243 Or App 246, 253, 259 P3d 941 (2011) (citation omitted). However,

> "[t]hose factors are neither the exclusive factors that this court will consider, nor are they to be applied mechanically. Rather, in determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract."

*Roble-Baker*, 340 Or at 641.

In this case, the questioning took place late at night on a remote country road. Although that locale was, strictly speaking, a public place, *see State v. Schwerbel*, 233 Or App 391, 397, 226 P3d 100, *rev den*, 349 Or 172 (2010) (noting that public location of the encounter made circumstances less compelling), it was not a setting familiar to defendant and was, in some sense, secluded. *Cf. Shaff*, 343 Or at 646 ("[T]he fact that the interview occurs in familiar surroundings[, such as a person's home,] diminishes the police-dominated atmosphere[.]"). Similarly, although the duration of the encounter—one hour—does not, by itself, suggest that the circumstances were compelling, defendant was subjected to the cold weather during most of that time. *Compare Saunders*, 221 Or App at 119-20 (interview in the defendant's home, which lasted one and a half hours, was not compelling), *with Schwerbel*, 233 Or App at 397-98 (circumstances became compelling during traffic stop although encounter lasted less than 15 minutes).

Bonds did not raise his voice, threaten defendant, or apply any physical restraints.[7] Moreover, although there were three officers at the scene, the interview with defendant was primarily one-on-one. On the other hand, factors weighing in favor of a conclusion of compelling circumstances include that a spotlight and blue and red flashing lights shone throughout the questioning, defendant's license was

---

[7] Defendant testified that Bonds threatened to arrest him, but that testimony is inconsistent with the trial court's ultimate conclusion and thus we do not consider it.

retained, defendant was not free to leave, and defendant was under Bonds's supervision throughout the encounter except for brief periods when Bonds conferred nearby with another officer. *See State v. McMillan*, 184 Or App 63, 68, 55 P3d 537 (2002), *rev den*, 335 Or 355 (2003) (finding that compelling circumstances existed where, among other things, a police officer took and retained the defendant's cell phone, the defendant was not free to leave, the officer supervised the defendant closely during the stop, and the officer confronted the defendant with incriminating evidence); *State v. Nevel*, 126 Or App 270, 276, 868 P2d 1338 (1994) (among the factors contributing to a lack of compelling circumstances was the fact that "none [of the patrol cars] had on flashing lights, a siren or a spotlight").

Those factors standing alone might not give rise to compelling circumstances. *See, e.g., McMillan*, 184 Or App at 68 (explaining that, although the stop involved lights and a siren, the defendant was not free to leave, and the officer supervised the defendant closely, "[t]hose factors * * * are present in many stops, and they are insufficient standing alone to make the circumstances * * * sufficiently compelling to require *Miranda* warnings"). However, in this case, there is an additional factor to consider: Bonds told defendant that his story did not match the alleged victim's account and implied that she had accused him of facts amounting to a crime. Bonds repeatedly pressured defendant to tell him more while confronting him with that false evidence of guilt. The Supreme Court has explained, "[W]hat matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Shaff*, 343 Or at 650. We conclude that the officer's repeated commands to divulge more information, coupled with his implications of guilt, gave the encounter coercive overtones. *See Roble-Baker*, 340 Or at 643 (noting that officers "heightened the intensity of the inquiry by putting questions to [the] defendant that assumed her guilt"). In light of that factor, and the other factors discussed above, compelling circumstances existed that warranted the administration of *Miranda* warnings.

Our decision is informed by *Shaff*. In that case, two officers went to the defendant's home after receiving a report

that a woman there had been injured. 343 Or at 641. One officer engaged in a general conversation with the defendant. When the subject matter turned to the woman's injuries, the defendant denied inflicting them. The officer "did not press the point." *Id.* at 642. After about 10 minutes, the second officer walked by with the woman. The officer speaking with the defendant then remarked that it was obvious that the woman had been assaulted and falsely suggested to the defendant that the woman had accused him of that crime. The defendant then made incriminating statements. The court concluded that the circumstances were not compelling:

> "In this case, [the officer] raised the issue whether the argument had become physical only twice during his approximately 10-minute conversation with defendant. The first time, the officer did not pursue the point after defendant's denial. The second time the officer raised the issue, he did so only after seeing, and noting, the woman's obvious injuries. The officer's questions were not coercive, aggressive, or repetitive. * * * Given the location of the encounter, the brief time that it lasted, and the absence of any 'heightened level of activity' by the officers, evidence that an assault had occurred (whether apparent to defendant or reflected in the officer's questions) is not sufficient to say that the officers had placed defendant in compelling circumstances that required *Miranda* warnings under the Oregon Constitution."

*Id.* at 650-51. *Cf. Roble-Baker*, 340 Or at 643-44 (circumstances were compelling where the defendant was subjected to questioning at police headquarters for five to six hours, the defendant was effectively unable to terminate the encounter, and officers asked the defendant questions that assumed her guilt); *State v. Machain*, 233 Or App 65, 75-76, 225 P3d 75 (2009) (circumstances were compelling where, among other factors, officers repeatedly told the defendant that they knew what happened and that she needed to tell the truth and asked her questions that assumed her guilt).

Unlike *Shaff*, here the encounter was prolonged and the officer persistently pressured defendant for more information in ways that assumed defendant's guilt. Moreover, the setting of the encounter was inhospitable and unfamiliar: defendant was isolated on a remote country road late at

night, he had to endure the frigid December weather, and he was questioned under the glare of a spotlight. Defendant was not free to leave and was subjected to close supervision. In sum, the officers "created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. Consequently, because defendant was not advised of his *Miranda* rights, his incriminating statements should have been suppressed. The trial court erred in concluding otherwise.

Reversed and remanded.