Argued and submitted June 15, 2021, affirmed April 6, 2022

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DAVID EDWARD REVETTE,
*Defendant-Appellant.*

### Multnomah County Circuit Court
18CR06219; A170972

508 P3d 985

Defendant appeals from a judgment of conviction for first-degree sexual abuse and first-degree sodomy. He raises three assignments of error. In the first assignment of error, he challenges the denial of his motion to suppress statements made during an interview with detectives; in his view, the circumstances of that interview were compelling, and he was thus entitled to *Miranda* warnings. In the second assignment of error, he challenges the trial court's limitation on his expert's testimony about proper child-abuse interview protocols. In his third assignment of error, he raises an unpreserved challenge to the trial court's imposition of a compensatory fine. *Held*: Because defendant was not in compelling circumstances when he made the statements, the trial court did not err by denying defendant's motion to suppress. Further, the Court of Appeals rejected defendant's second assignment of error, because defendant failed to make an offer of proof that allowed the court to determine whether the error was harmful. Lastly, defendant's third assignment of error was unpreserved, and the court declined to exercise its discretion to review the claim as plain error.

Affirmed.

Jerry B. Hodson, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Joyce, Judge, and DeVore, Senior Judge.*

_____
* Joyce, J., *vice* DeHoog, J. pro tempore.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for first-degree sexual abuse and first-degree sodomy. He raises three assignments of error. In the first assignment of error, he challenges the denial of his motion to suppress statements made during an interview with detectives; in his view, the circumstances of that interview were compelling and he was thus entitled to *Miranda* warnings. In the second assignment of error, he challenges the trial court's limitation on his expert's testimony about proper child abuse interview protocols. In his final assignment of error, he raises an unpreserved challenge to the trial court's imposition of a compensatory fine. As we explain below, we conclude that the trial court properly denied defendant's motion to suppress, because defendant was not in compelling circumstances when he made the statements. We reject defendant's second assignment of error, because defendant failed to make an offer of proof that allows us to determine whether the error is harmful. Defendant's third assignment of error is unpreserved, and we decline to exercise our discretion to review it as plain error. Accordingly, we affirm.

We review the trial court's denial of a defendant's motion to suppress for legal error. *State v. Northcutt*, 246 Or App 239, 245, 268 P3d 154 (2011). We are bound by the court's findings of historical fact if there is constitutionally sufficient evidence in the record to support them. *State v. Love-Faust*, 309 Or App 734, 736, 483 P3d 45, *adh'd to as modified on recons*, 311 Or App 756, 489 P3d 149 (2021). We thus set out the facts consistent with the trial court's explicit and implicit findings and its decision denying defendant's motion to suppress. *Id.*

## I.   FACTUAL BACKGROUND

A.   *The victim discloses sexual abuse by defendant.*

The victim, N, is an 11-year-old child. Defendant is N's mother's domestic partner. N had regular visitation with her father. At the end of one of those visits, as her father was returning N to her mother's home, N became upset. N then disclosed to her mother and father that defendant had touched her vagina. N's parents contacted law enforcement.

Over the next several days, N met with Department of Human Services (DHS) caseworkers and underwent an evaluation at CARES Northwest. N disclosed to DHS caseworkers that defendant had touched "her private parts under [her] underwear." During her CARES Northwest evaluation, N disclosed that defendant had come into her bedroom at night and touched her vagina with his hand and mouth. When N asked defendant what he was doing, he responded that he was fixing the blankets around her. N said that that happened on more than one occasion.

B.  *After the disclosures, police interview defendant.*

After N's disclosures to her mother, DHS caseworkers, and CARES Northwest, police set up a meeting with defendant. That is the interview that defendant contends put him in compelling circumstances so as to warrant *Miranda* warnings. Whether the circumstances surrounding a police interview are compelling is inherently fact-dependent. We therefore describe the interview at issue here in some detail.

Gresham Police Detective Bigeagle talked with defendant by phone to set up the interview. Defendant agreed to come to the Family Services Division building in Portland for an interview. That building is a two-story building that houses a detective division, domestic violence advocates, a district attorney's office, and DHS. The room where Bigeagle met defendant is just off the main common lobby of the building and near two exits, separate from the area used by police officers. Neither exit is locked. The building itself "looks like a normal office building, not a typical police station."

Defendant arrived in late morning and the interview lasted a little over an hour. During the interview, the door to the conference room was closed but unlocked. Bigeagle was the only officer present, and he was not blocking defendant's exit. Bigeagle was not in uniform, instead wearing jeans, a button-up shirt, and tennis shoes. At the outset of the interview, he emphasized that defendant was free to leave: "We also talked about you're free to leave, you're not under arrest. No matter what you tell me today you're going to be walking out that door. The door is unlocked. You can just shoot out that way. It's your option to be here."

Bigeagle advised defendant of his rights and presented him with a "constitutional rights advice Miranda form." Defendant read the form out loud and asked Bigeagle several questions. More specifically, defendant asked about his entitlement to a lawyer: "Like technically, get a lawyer for this scenario right now? *** Because technically it's a questioning." Bigeagle responded by telling defendant that he could "get it now, but it won't be paid for by the court because you haven't been charged with anything." Bigeagle then reminded defendant that he had the right to remain silent and did not have to talk with the detective. He then clarified that defendant was entitled to a court-appointed attorney if he was charged with a crime. Defendant stated that he understood and signed the form.

Bigeagle began the interview with a discussion of defendant's relationship with the victim's mother, defendant's own children, and his work. Defendant said that he typically puts N and her sister to bed, because their mother works late. He described the routine and that when he checks on the girls, he sometimes adjusts blankets.

Bigeagle then said, "to kind of cut to the chase here, [N] says and it's kind of—she mentions when you come in and do the blanket thing in the bedroom. Only she says that there were times when you actually touched her." He explained, "Well, I mean, and I'm saying touched her, I mean touched her private parts." Defendant denied that he had ever done so. He again explained that he adjusted blankets to ensure that N was warm and that sometimes, when the blankets were "wedged in there, yeah, of course I'll wake her up." Bigeagle then asked whether there was a chance that "unintentionally your hand may have touched some of that area?" Defendant denied that he would have done so. Bigeagle asked defendant whether there was "a possibility you touched her on the buttocks or the front end" when adjusting the blankets. After defendant denied that he had done so, Bigeagle explained:

> "Now [N]'s allegation is just to be straight up with you is, at those times you're talking about going to the bed and covering her up, which is all fine, you actually touch her vagina during that time and it happened on more than one occasion.

"She said that she would kind of fake like she's asleep because it bothered her so much. That's what her allegation is on that.

"And she said it started a few years ago and when she talked about it, she didn't want to talk about it. She wasn't like—I saw the interview, she didn't act like she wanted to get you in trouble. She just was kind of confused as to why this happened, you know."

Bigeagle explained that N's disclosures had been made during a CARES Northwest evaluation. He explained that CARES Northwest has professionally trained interviewers who talk to children. During the interview with N, she made statements that Bigeagle described to defendant as being "a real believable story about this interaction between you and her." Bigeagle then described CARES Northwest's process as "being accurate." Particularly with younger children who make disclosure's like N's, "more often than not, something happen[ed] there." Defendant again denied the allegations.

Bigeagle then stated that he did not want to downplay the allegations, but that he did not believe that defendant was "a monster," although based on what N described, "something happened there." "And that's what we got to find out what happened. And that's kind of why I'm here to talk to you about it and find out. Can we get to the bottom of that?" Bigeagle then reiterated his belief that the CARES Northwest interview was "super powerful." He stated, "And I got to be honest with you, I believe from seeing her interview, that gut wrenching testimony she gave that I believe that something happened there." Defendant again denied the allegations. Bigeagle asked whether defendant could have touched N by moving blankets around and while defendant agreed that might have been true, there was "no fondling."

After some back and forth, Bigeagle returned to the CARES Northwest interview and described N as being

"so definitive. I mean, it was heart wrenching for me. I'd watch a lot just to see how much she was struggling. But she wasn't portraying herself as wanting to get you or something. But she was definitely concerned that this behavior

was happening. And as a kid, she didn't really know how to deal with it.

"So she would stay awake until you came in—and she's telling us this, until you came in. And when you would try to do the touching, then she would act like she woke up, then you would say, oh, I'm just putting the blanket on you."

Bigeagle observed that N stated that it had happened several times and "[t]hat was pretty much how it happened each time." Defendant responded, "Is that a question?" Bigeagle answered, "Well, I'm just telling you what she's saying. I kind of want you to chew on that a little bit." He went on, "But I got to be honest with you [defendant], and I told you I'd do that from the start. Something did happen." Defendant denied that something had happened. Bigeagle said that he believed that, and that he also found N's disclosures "very believable, very believable."

After some more back and forth, Bigeagle observed that N was young enough that to have made up the allegations would be "really unusual[,]" so "something happened there." Bigeagle explained to defendant that he did not believe that defendant was a "pedophile" but that perhaps it could have been a "mistake type situations where your moment of weakness or whatever you want to call it, where it happens. And I think that's what happened here." Defendant responded, "No."

Bigeagle again suggested that perhaps defendant had had a "lapse in judgment." After making that suggestion, Bigeagle raised for the first time N's disclosure that defendant had performed oral sex on her. Defendant responded, "That's beyond absurd." The detective described the "touching with your tongue in the vagina" as being "a little bit harder to explain." Defendant denied the allegation.

At that point, Bigeagle offered defendant a polygraph. In response, defendant said that he would need to talk to his attorney. Bigeagle agreed that defendant should talk to his attorney if he had any doubts and described the polygraph process, including that the results were inadmissible in court. Defendant indicated that he would be open to that.

Defendant then asked the detective about how long the interview was going to take. Bigeagle responded that it would be "[a]s long as you want it to be. I want to—it's your time. I mean, I want to make sure you get everything out that you wanted to tell me." Defendant asked if he could have a bathroom break. Bigeagle told defendant that he was free to go and asked whether defendant wanted to use the bathroom and come back. He indicated that he was "pretty much done" with the interview, but defendant said that he had "a few things" that he wanted to cover with the detective.

When he returned, defendant told the detective that he had written some things down in anticipation of the interview and he thought that he and the detective had covered most of it. Bigeagle clarified with defendant that defendant wanted to talk to him without an attorney and defendant indicated that he still had a few things to talk about. Bigeagle clarified with defendant that he wanted to continue talking with him, stating, "You still want to continue? You still had some stuff you wanted to tell me? *** But I just want to make sure that you're okay doing that, is that right?" Defendant responded affirmatively.

Defendant described that he had observed the family's dog licking N's and her sister's "privates" on several occasions while the girls were in their bed. Defendant then ran down his list and noted that he and the detective had gone over most of the points he had listed. Defendant ended by saying, "That's it." Bigeagle then terminated the interview.

## C.  *Motion to Suppress Hearing*

The state subsequently charged defendant with several sexual offenses. Defendant moved to suppress the statements he made to Bigeagle. He argued that he was in compelling circumstances when he made the statements, was entitled to *Miranda* warnings, and that the warnings that Bigeagle provided were inadequate.[1] During the hearing on the motion to suppress, the state played the recording of the interview. Defendant then largely reprised his arguments

---

[1] Although defendant never confessed to any crime during the interview, the state used statements that defendant had made in the interview during the prosecution.

in support of his motion to suppress, adding that the fact that Bigeagle advised defendant of his *Miranda* warnings at the outset was a factor that weighed in favor of a finding of compelling circumstances. In his view, those warnings "create a feeling that a defendant is not able to terminate an encounter[.]"

The trial court denied defendant's motion to suppress, concluding that defendant was not in compelling circumstances and thus *Miranda* warnings were not required.[2] Having listened to the recording of the interview, the trial court found that the detective's tone throughout the interview was "very conversational" and "not in a way that one would typically categorize as interrogation." The court found the following facts in concluding that defendant was not in compelling circumstances:

- Defendant and Bigeagle arranged for the meeting in advance and defendant agreed to come to the police station on his own. Defendant was thus not reliant on police for a ride home.

- Bigeagle was in plain clothes rather than in uniform.

- The two met in the Family Services Division in a conference room in the lobby, which looks like a normal office building, "not a typical police station."

- The lobby is used by various entities in the building and is near two exits.

- The place where the interview occurred is not secured—anyone could leave out of the exits at any point.

- Bigeagle told defendant at the outset that defendant was free to leave "in a very clear unambiguous way" and that he was not under arrest.

- The detective was not blocking defendant's exit from the room.

---

[2] As explained below, we agree with the trial court on that point; thus, we do not reach defendant's alternative arguments described above, including whether the *Miranda* warnings that were given were inadequate.

- The trial court, having heard the recording of the interview, observed that Bigeagle was "professional, calm and polite" during the interview.

- There was nothing coercive in the questioning. Bigeagle confronted defendant with evidence but in a "very conversational manner and not in a way that one would typically categorize as an interrogation."

- He brought with him a list of topics he wanted to cover and then, after taking a bathroom break and returning, he reviewed the topics he wanted to discuss with the detective before leaving.

- The interview lasted approximately a little over an hour, in late morning.

Based on those findings, the trial court concluded that defendant was not in compelling circumstances. Additionally, the trial court also rejected defendant's suggestion that the giving of *Miranda* warnings somehow increases the coercive nature of the interview.

## II.  ANALYSIS

On appeal, defendant challenges the trial court's denial of his motion to suppress. Article I, section 12, protects an individual's right against compelled self-incrimination and thus requires *Miranda* warnings for any individual "who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be compelling.'" *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (internal citations omitted).

Because defendant was not in full custody, the question is whether defendant was in compelling circumstances. In answering that question, our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641. We consider the totality of the circumstances, including (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *Id.* at 640-41. The "question whether the circumstances were compelling does not turn on either the

officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood [the] situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007).

Before turning to those factors, we acknowledge at the outset that this case is a close one. Some aspects of the interview bear the hallmarks of what is often considered the kind of police-dominated atmosphere that *Miranda* warnings are intended to counteract. But in light of recent precedent and in the totality of the circumstances, we conclude that the circumstances of this interview were not compelling.

We begin with the location of the encounter. Police station interviews are generally viewed as more compelling than settings more familiar to the defendant. *See State v. Grimm*, 290 Or App 173, 180, 414 P3d 435, *rev den*, 363 Or 283 (2018) (observing that "the unfamiliar, police-station setting of the interview tended—necessarily—toward a 'police-dominated atmosphere'"); *Shaff*, 343 Or at 646 (the fact "that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract"). Yet even where a defendant is questioned in a police station or similar setting, other factors may reduce the "police-dominated atmosphere" of the location. *See, e.g.*, *Grimm*, 290 Or App at 180 (the fact that the defendant voluntarily drove to the police station for the interview "lessened somewhat" the effect of the location of the interview, because "the defendant came to the station voluntarily, on his own power and at a time of his own choosing").

The location of the interview here weighs somewhat in favor of a conclusion that defendant was in compelling circumstances, though not significantly. The interview took place in a building that contains police offices and was a location that was unfamiliar to defendant. Those facts "ten[d]—necessarily—toward a 'police-dominated atmosphere.'" *Id.* Yet other facts are present that reduce that police-dominated atmosphere. The building itself presents like a normal office building, not a police station. The interview occurred in the common area of the building (*i.e.*, not the areas used as

police offices), in a conference room just off the lobby. The interview room is near two exits, which anyone can leave through without restriction. Additionally, defendant came to the station voluntarily and drove himself, further lessening any "police-dominated atmosphere." *See State v. Barber*, 179 Or App 674, 679, 41 P3d 455, *rev den*, 334 Or 632 (2002) (no compelling circumstances where the defendant agreed to voluntarily come to the police station for questioning, made an appointment and then arrived an hour late, and never indicated that he wanted to leave). Thus, although defendant was in an unfamiliar building used by police, thereby tending towards a "police-dominated atmosphere," this factor does not weigh heavily in favor of finding compelling circumstances given the countervailing facts.

The length of the encounter weighs against a conclusion that the circumstances were compelling. The interview lasted a little over an hour. That amount of time by itself does not lend itself towards a finding of compelling circumstances. *See Grimm*, 290 Or App 180 (where the interview took "at most, one and one-half hours," that amount of time was not itself determinative of compelling circumstances). That said, as we have noted on previous occasions, this factor "is necessarily dependent on the character or quality of the interaction"; thus, "the principal emphasis is properly on the qualitative dynamics addressed in the third and fourth of the *Roble-Baker* factors." *Northcutt*, 246 Or App at 250.

We turn to those two factors. The third factor focuses on the amount of pressure that law enforcement exerts on a defendant during the interview. Pressure can come in "the form of officers' aggressive tone or demeanor, contributing to a determination of compelling circumstances. Conversely, an officer's calm, conversational, and nonconfrontational demeanor can sometimes weigh against a compelling-circumstances determination." *State v. Phillips*, 302 Or App 618, 626, 459 P3d 909, *rev den*, 366 Or 552 (2020). Confronting a suspect with evidence of guilt, without more, does not make circumstances compelling. *Id.* at 631. Rather, what matters "is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Shaff*, 343 Or at 650.

*Grimm* is particularly instructive in illustrating when an interview becomes compelling. There, a woman reported that the defendant, who was installing internet in her home, had pulled down his pants and exposed himself. *Grimm*, 290 Or App at 174. At the officer's request, the defendant agreed to go to the police station to discuss the report. *Id.* Two officers interviewed the defendant in a meeting room that was near the main lobby of the building. *Id.* at 175. After the defendant explained what had happened, the officers told the defendant that his version of events was inconsistent with the complainant's. *Id.* at 175-76. The defendant then repeated his version of events several times, each time adding details that he had not before. *Id.* at 176. The questioning officer repeatedly told the defendant that she did not think his story made sense, would point out the inconsistency in his story, and "give him another chance to tell me the story[.]" *Id.* That happened several times. *Id.* At that point, the officer "changed tactics" and asked the defendant whether he watched pornography and began telling the defendant that he had a "sexual addiction problem." *Id.* at 176-77. The officer expressed her belief that the defendant was aroused by the prospect of "being in proximity to the complainant and getting caught, that he had a sexual addiction problem, and that he needed counseling." *Id.* at 183. The officer then told the defendant to tell them "what really happened" and defendant confessed. *Id.* at 184.

We concluded that the circumstances were not compelling at the interview's outset, because the officers "simply confronted defendant with incriminating evidence—the complainant's version of events—in a noncoercive and non-aggressive manner and asked defendant for his side of the story." *Id.* at 183; *see also State v. Courville*, 276 Or App 672, 678, 368 P3d 838 (2016) (compelling circumstances were absent where an officer, in a friendly and conversational manner, questioned the defendant at his home, confronted him with allegations of abuse, indicated several times that the officer believed the victim, and encouraged the defendant multiple times that he needed to admit the truth of the victim's allegations for her benefit).

But we concluded that at the point where the officer began asking the defendant about watching pornography

and his sexual habits, the circumstances became compelling. That was because those tactics "were calculated to contradict defendant's repeated assertions of innocence and pressure him to continue talking." *Grimm*, 290 Or App at 184. The officers prolonged the encounter and "persistently pressured defendant for more information in ways that assumed defendant's guilt." *Id.* At that point, then, the officers were obligated to provide the defendant with *Miranda* warnings. *Id.*

Applying *Grimm* to the facts of this case, we conclude that the third factor also does not weigh in favor of a finding that the circumstances were compelling. On one hand, Bigeagle was very conversational throughout the interview. He was in plain clothes, repeatedly told defendant that he was free to leave, and told defendant that no matter what, he would be leaving the building at the end of the interview. Defendant reinitiated the interview after a bathroom break to continue the discussion, which reflects that he was not feeling pressured or coerced to remain.

On the other hand, Bigeagle confronted defendant with the victim's allegations, described CARES Northwest as being "pretty accurate," and repeatedly—in the face of defendant's denials—expressed that he knew that something had happened and that he believed that the victim was telling the truth. But as *Grimm* and *Courville* demonstrate, repeatedly expressing disbelief about a defendant's story, expressing belief that the victim or complainant was telling the truth, and encouraging the defendant to be truthful does not, without more, create compelling circumstances.

That holds particularly true when there is no accompanying increase in intensity or aggression in the manner or form of questions.[3] Once more we turn to *Grimm*. There, despite the fact that the officers confronted the defendant with incriminating evidence, persisted, and "escalat[ed] the pressure" by repeatedly telling him that his explanations

---

[3] We similarly reject defendant's argument that giving *Miranda* warnings contributed to circumstances that were compelling. *State v. Turnidge (S059155)*, 359 Or 364, 404 n 24, 374 P3d 853 (2016) (rejecting idea that recitation of *Miranda* rights transformed the nature of the encounter from one that was not compelling into one that was).

did not make sense and repeatedly asking him to explain the inconsistencies, we concluded that was insufficient to create compelling circumstances. *Grimm*, 290 Or App at 184. Once the officer began asking the defendant about his sexual habits, we deemed the totality of the circumstances had tipped towards being compelling. *Id.* at 183-84.

This case is not meaningfully different than *Grimm* before the point that that interview became compelling: as in *Grimm*, although Bigeagle repeatedly expressed to defendant that he believed that something had happened, that N was believable, and that the CARES Northwest process was accurate, that approach, without more, does not transform an interview into compelling circumstances. As described above, in light of the other circumstances of the interview, that "more" is missing.

That conclusion is further reinforced considering the fourth factor, whether defendant was free to terminate the encounter. Bigeagle told defendant at the outset that he was free to leave, stating, "You're free to leave, you're not under arrest. No matter what you tell me today you're going to be walking out that door. The door is unlocked. You can just shoot out that way. It's your option to be here." When defendant asked for a bathroom break, Bigeagle reiterated that defendant was free to go.

In sum, the circumstances of the interview between defendant and Bigeagle, viewed in their totality, did not produce "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. We therefore conclude that the trial court correctly denied defendant's motion to suppress.

We turn to defendant's second assignment of error. At trial, defendant sought to offer testimony through an expert, Dr. Bourg, on interviewing practices in child sexual abuse cases. More specifically, defendant asked that Bourg be allowed to testify about, among other topics, the flaws in the victim's interviews in this case, including with CARES Northwest. The parties agreed that whether that testimony was permissible was controlled by *State v. Black*, 289 Or App 256, 407 P3d 992 (2017), *rev'd*, 364 Or 579, 437 P3d 1121 (2019). We held in that case that an expert cannot offer

testimony to suggest that a child witness is not telling the truth by opining that the interviews of that child included leading, suggestive, or coercive questions. *Id.* at 260. The trial court thus instructed Bourg that she could offer opinions about accepted interview techniques, but she could "not specifically comment on the techniques that were used by linking it to this specific case."

After defendant's trial in the present case, the Supreme Court reversed our decision in *Black*. 364 Or 579. On appeal, the parties agree that, in light of that decision, the trial court erred in limiting Bourg's testimony. We agree. But the state argues that, because defendant failed to make an offer of proof that would allow us to determine whether the error is harmful, we should nonetheless reject defendant's assignment of error.

We agree that defendant failed to make a sufficient offer of proof. *State v. Morgan*, 251 Or App 99, 104, 284 P3d 496 (2012) ("[A]n offer of proof ordinarily is required to preserve error when a trial court excludes testimony."). Unlike in *Black*, where the defendant made an "abbreviated" offer of proof, 364 Or at 598, defendant here made no attempt to explain to the trial court what he expected Bourg to testify about. Defendant presumes that Bourg would testify about any shortcomings in N's CARES Northwest interview, but the record before us contains no basis to know if that would be the case. In the absence of an offer of proof, we thus cannot determine whether any error was harmful, and we therefore reject defendant's claim of error.

In his final assignment of error, defendant argues that the court erred in imposing a $3,000 compensatory fine to the minor victim. Defendant did not object to the fine below but asks us to exercise our discretion to review his claim for plain error in light of *State v. Moreno-Hernandez*, 365 Or 175, 442 P3d 1092 (2019) (rejecting a compensatory fine awarded to a minor victim where the record did not show that the child incurred her own expenses).

We decline to review defendant's claim as plain error. Where a defendant may have had a strategic reason not to object, an error is not plain. *State v. Gornick*, 340 Or 160, 170, 130 P3d 780 (2006) (where one inference is that

the defendant chose not to object, the error is not plain). Here, defendant may have had strategic reasons for not objecting, including avoiding a larger fine and sentence. *See* ORS 161.625(1)(b) (allowing for a financial penalty of up to $375,000 for Class A felony); *State v. Debuiser*, 249 Or App 203, 207, 275 P3d 199 (2012) (declining to review an unpreserved challenge to imposition of a $200 compensatory fine because defendant could have plausibly "chosen not to object *** to avoid the imposition of the same or similar fine" under a statute that authorized a penalty of up to $2,500 in such circumstances). We therefore decline to review this claim of error.

Affirmed.